# STATE OF MICHIGAN

# COURT OF APPEALS

---

THOMAS L. THESIER and JUDITH L. THESIER,

          Plaintiffs-Appellees/Cross Appellants,

v

T.B.S.K. LIMITED PARTNERSHIP, B. S. & K., DIANE BARTON, ESTATE OF SOL SONENKLAR, as successor of SOL SONENKLAR, individually and as a Partner of B. S. & K., and RODGER BARTON,

          Defendants,

and

ESTATE OF AUDREY KLEIN, as successor of AUDREY S. KLEIN, individually and as a Partner of B. S. & K.,

          Defendant-Appellant/Cross Appellee.

UNPUBLISHED
May 22, 2018

No. 336398
Ingham Circuit Court
LC No. 11-000678-CR

---

Before: MURPHY, P.J., and JANSEN and SWARTZLE, JJ.

PER CURIAM.

In this case involving the winding up of a partnership, defendant-appellant/cross-appellee Estate of Audrey Klein ("defendant Klein Estate" or just "defendant") appeals as of right, and plaintiffs-appellees/cross-appellants Thomas and Judith Thesier ("plaintiffs") cross-appeal as of right, the circuit court's judgment entered after a bench trial. We affirm with respect to defendant Klein Estate's issues on appeal, but remand this case to the trial court for further proceedings in connection with plaintiffs' issues on cross-appeal.

-1-

# I. BACKGROUND

Testimony and other evidence offered during the bench trial and prior proceedings show the following: Diane Barton, Sol Sonenklar (now deceased), and Audrey Klein (now deceased) formed the B. S. & K. Partnership in June 1995, the purpose of which was to develop certain property in Mason, Michigan. The T.B.S.K. Limited Partnership was formed by an agreement executed in October 1995 by B. S. & K. as the general partner and plaintiffs as limited partners. The purpose of the limited partnership was to acquire or hold real property in Ingham County in order to construct and operate a shopping center. The agreement provides that the partnership would terminate on August 1, 2015, "unless earlier dissolved and terminated pursuant to the [Revised Uniform Limited Partnership] Act or any provision of this agreement." B. S. & K. agreed to contribute $185,000 to the venture, and plaintiffs agreed to contribute an interest in real property in Mason on which the shopping center would be developed.

Several provisions of the T.B.S.K. agreement are relevant to this dispute. Section 3.1 states that net partnership profits or losses are to be allocated "50 percent to the General Partner and 50 percent to the Limited Partner." Section 4.1 provides that management of the partnership "shall in all respects be the full and complete responsibility of the General Partner alone." Sub-section 4.3(e) states that B. S. & K. "[m]ay enter into any loan agreement to borrow money necessary or desirable to conduct [T.B.S.K.'s] business," but also clarifies that "Limited Partners [i.e., plaintiffs] shall have no personal liability for these borrowed amounts." Sub-section 4.3(*l*) also authorizes B. S. & K. to "sell, exchange, distribute, or otherwise dispose of some or all of the property or the project (even though doing so may cause a dissolution, winding up, and termination of the Partnership)." Section 6.2 expressly prohibits B. S. & K. from withdrawing from the T.B.S.K. partnership. Upon termination of the partnership, section 7.1 specifies that "the partnership shall transfer its interest" in the real property plaintiffs contributed to it, including the building upon it, back to plaintiffs "free of any debts or liens." The section further states that "the General Partner shall wind up the Partnership and apply and distribute the remaining assets" in accordance with section 3.2, i.e., "in accordance with the Partner's percentage interest in the Partnership at the time of the distribution." The agreement also includes an integration clause. See section 10.3.

The shopping center was constructed and financed with a mortgage from Old Kent Bank, and, when construction was finished, the loan was refinanced with Standard Insurance Company. The center was initially managed by Sol Sonenklar, and then by defendant Rodger Barton, husband of defendant and B. S. & K. partner Diane Barton. The project was refinanced again in 2004 with a mortgage from Auto Owner's Insurance Company ("Auto Owner's") in the amount of $1,460,000. Sonenklar executed the loan on behalf of T.B.S.K., although he also sought and received a consent resolution from plaintiffs. By its terms, the resolution does not attempt to modify the T.B.S.K. agreement, including sub-section 4.3(e)'s provision that plaintiffs "shall have no personal liability for these borrowed amounts." The loan was set to mature on August 1, 2014 to be paid with a balloon payment on that date.

In June 2011, a box containing all original partnership records, along with other documents necessary to the operation of the business, was left on plaintiffs' front porch. Thomas Thesier described his failed attempts to contact the partners of B. S. & K., but-for reaching

Audrey Klein by telephone, who, according to Thomas, "said that she didn't know much about it and she . . . didn't want anything to do with it. She said, you do what you want to do."

Plaintiffs immediately filed this lawsuit and asked for an ex parte order of receivership of T.B.S.K. The trial court appointed Thomas[1] as receiver of the partnership. Shortly after, counsel for Audrey Klein entered an appearance and objected to the appointment of Thomas as receiver. Counsel argued that, as a party to this lawsuit, Thomas had interests that may conflict with the fiduciary responsibilities of being a receiver. Counsel reiterated her arguments during a hearing on attorney fees held a couple of months later. And yet, counsel did not object to Thomas managing the property; in fact, counsel stated, "I am not saying that they [plaintiffs] have done something that I find egregious. Actually, Audrey Klein, as her counsel, I recognize someone has to manage. It's just the title of receiver that causes me concern." Counsel indicated that neither her client nor Sol Sonenklar's widow were capable of stepping in and managing the property. Counsel also recognized that, as a practical matter, the property had "limited rents, and, you know, it's not cash flowing," and she concluded, "So I understand that that [appointing a different person or entity as receiver] would put us in a negative position, and I don't want to harm the property and put it in jeopardy either."

The trial court noted the potential conflict of interests, but it also recognized that a different receiver was "going to cost money . . . . So you may want to reflect on whether you want to do that or not, because it's going to cost more money to the ultimate estate here and besides your services." The trial court also noted that the equities to-date weighed in plaintiffs' favor:

> THE COURT: Okay. Ms. Bankey [Audrey Klein's counsel], one comment here is that his clients [plaintiffs], I remember them coming to Court, were not trying to manage anything. They were just people that had an interest and suddenly the guy [Rodger Barton] blows the coop, leaves your clients up in the air.
>
> MS. BANKEY: Right.
>
> THE COURT: Leaves these poor people up in the air, and so they did what they had to do to make sure that things were collected and the mortgage was paid and various things were done. It seems to me that, you know, there hasn't been anything going on here that's of any bad nature to this point.

The trial court did suggest that if the parties could figure out a mutually agreeable alternative to having Thomas act as receiver, the trial court would entertain such an alternative. Thomas subsequently filed a second report (October 2012) and a third report (July 2014) without objection, and Audrey Klein never offered an alternative as receiver. Audrey Klein passed away in September 2015, and her estate was substituted as defendant. Thomas filed a fourth report in

---

[1] To avoid any confusion, when referring to Thomas Theseir in his capacity as receiver, we will use just his first name.

November 2015, and defendant Klein Estate did object to that report. Similarly, however, defendant did not offer a specific alternative as receiver in that objection. For its part, as the mortgagee, Auto Owner's had the contractual right to have a receiver appointed, and it consented to have Thomas act as the receiver. Ultimately, Thomas remained receiver throughout the lawsuit.

The mortgage was in default throughout the receivership, including on the payoff date, August 1, 2014. Thomas received an extension to August 1, 2015. Under the T.B.S.K. agreement, plaintiffs were entitled to return of the real estate (including the building) "free of any debts or liens" by August 1, 2015. At that time, however, the property was still financially underwater. It does not appear that Thomas-as-receiver made a call on the partners of T.B.S.K. for specific performance or financial compensation (although plaintiffs did seek damages by way of this lawsuit). Instead, Thomas sought and received another extension. The property was eventually sold in 2016, and $287,857.65 remained after satisfaction of the mortgage. The net proceeds were deposited into a trust account.

Plaintiffs sought distribution of the net proceeds to themselves as well as judgments against defendants B. S. & K. and defendant Klein Estate reflecting the extent to which the outstanding mortgage obligation prevented plaintiffs from recovering the full value of the real property. On June 1, 2016, shortly after the property had been sold, the trial court set October 31, 2016 as the date for bench trial. A default was entered against defendant B. S. & K. on August 31, 2016.

On October 6, 2016, plaintiffs moved for summary disposition under MCR 2.116(C)(10) against defendant; they also moved for default judgment against defendant B. S. & K. With respect to defendant, plaintiffs abandoned their claims of conversion and accounting and focused on their sole remaining claim of breach of the T.B.S.K. agreement.

Defendant responded on October 20, 2016, opposing summary disposition in favor of plaintiffs. Defendant also asked for summary disposition in its favor under MCR 2.116(I)(2). As for B. S. & K., defendant did "not take a position" on plaintiffs' motion for a default judgment, with the proviso that its position was "conditioned upon the Default Judgment having no adverse affect upon the Estate of Audrey S. Klein." Moreover, defendant asserted that "[p]laintiffs' maneuver appears to be a thinly veiled attempt to seek payment from the Estate through a Judgment against BS&K Partnership." Defendant followed this up with a motion to remove Thomas as receiver filed on October 26, 2016.

The trial court informed the parties that, after reviewing the summary disposition briefs, it determined that a bench trial was needed. The trial court did not specifically rule on the motions. At the close of proofs of the bench trial, the trial court's findings included the following:

> [W]hat I have seen here is a managing partner or a managing person who was running this simply walking away. None of the other people come forward. . . . [T]hese poor people [plaintiffs] get stuck with everything. And now you [defendant Klein Estate] come in here and nitpick everything that they have done

in an effort to preserve this thing. So with all due respect, it's not their fault that people did not do anything.

But . . . I think it is pretty straightforward that at the termination of the agreement . . . these people had the authority to obtain and have good title to the land . . . and its pertinences, and that the money that's left here substitutes for those. So the Court hereby finds that the money should go to [plaintiffs].

The trial court ordered that the funds held in the trust account under the trial court's earlier order "shall be released to the Receiver appointed in this matter, Thomas Thesier," who was then to distribute the money to plaintiffs in accordance with the T.B.S.K. agreement in lieu of the real property. The trial court declined to order any relief against defendants Diane and Rodger Barton because those defendants were never served, and declined to order any relief against defendant Estate of Sol Sonenklar because plaintiffs did not pursue the litigation against it. The trial court's judgment further provided that any relief sought against defendant B. S. & K. was denied "other than as specifically set forth in this Judgment."

This appeal and cross-appeal followed.

## II.  ANALYSIS

### A.      Defendant Is an "Aggrieved Party" for Purposes of this Appeal

We begin our analysis not with a claim of defendant's, but rather with an argument of plaintiffs' that defendant lacks "standing" to pursue any claim on appeal. Plaintiffs assert, "When distilled to its simplest form, the issue of the underlying case is what happens to the property held by T.B.S.K.?" Plaintiffs then point out that Audrey Klein did not have an interest in T.B.S.K., though she did have an interest in B. S. & K. Had Audrey Klein or defendant as her successor-in-interest wished to defend B. S. & K, she or defendant could have sought to do so before the trial court, but neither did. Finally, plaintiffs assert that there is not a judgment "against" Audrey Klein or defendant from which to appeal.

We reject plaintiffs' position because (a) plaintiffs do not appear to be arguing about actual "standing," and (b) defendant is an aggrieved party for purposes of appeal. As noted by the Supreme Court in *Federated Ins Co v Oakland County Road Comm'n*, 475 Mich 286, 290; 715 NW2d 846 (2006), "standing refers to the right of a party plaintiff *initially* to invoke the power of the court to adjudicate a claimed injury in fact. In such a situation it is usually the case that the defendant, by contrast, has no injury in fact but is compelled to become a party by the plaintiff's filing of a lawsuit." Rather than standing, what plaintiffs appear to be referring to is the "similar interest . . . vindicated by the requirement that the party seeking appellate relief be an 'aggrieved party' under MCR 7.203(A) and our case law." *Id.* at 290-291.

This Court has jurisdiction of an appeal by right of a final judgment of the trial court filed by an aggrieved party. MCR 7.203(A). An aggrieved party is one who has "suffered a concrete and particularized injury" arising from the actions of the trial court. *Manual v Gill*, 481 Mich 637, 643-644; 753 NW2d 48 (2008) (internal citation and notation omitted). "To be aggrieved, one must have some interest of a pecuniary nature in the outcome of the case, and not a mere

possibility arising from some unknown and future contingency." *Federated Ins*, 475 Mich at 291 (internal citation and quotation marks omitted).

Plaintiffs sued Audrey Klein in both her individual capacity as well as her capacity as a partner of B. S. & K. Defendant stepped into the shoes of Audrey Klein as her successor-in-interest. Defendant argued in its brief, during trial, and now on appeal that the T.B.S.K. agreement had not been breached by defendant but, instead, had been breached by plaintiffs. Defendant argued that the net proceeds from the sale of the property should have been split equally among plaintiffs and the partners of B. S. & K. Had the trial court agreed with defendant, the B. S. & K. partners (including defendant) would have collectively received approximately $143,928.83. The trial court concluded otherwise and ordered that the proceeds be distributed to plaintiffs, and this constituted a "concrete and particularized" injury to defendant sufficient to invoke this Court's review.

Moreover, plaintiffs cannot have it both ways. On the one hand, they argue that defendant does not have an interest in this appeal, but on the other hand, they argue that this matter should be remanded to the trial court and defendant should be held liable for the debts of B. S. & K. as the success-in-interest to Audrey Klein's interest in that partnership. Indeed, under Michigan law, every partner in a general partnership is an agent of the partnership, MCL 449.9(1); *Birch Run Nursery v Jemal*, 52 Mich App 23, 25; 216 NW2d 488 (1974), and this agency generally renders the partner jointly and severally liable for any wrongful act of the partnership or another partner, MCL 449.13; MCL 449.15. Given this, we find that defendant is an aggrieved party for purposes of this appeal.

B.    Trial Court Did Not Abuse Its Discretion by Holding a Bench Trial In Lieu of Ruling on Motions for Summary Disposition

For its part, defendant initially argues that the trial court erred by proceeding to the bench trial without deciding the parties' cross-motions for summary disposition that promised to be dispositive. Defendant's argument is without merit.

Trial courts "have express authority to direct and control the proceedings before them." *Maldonado v Ford Motor Co*, 476 Mich 372, 376; 719 NW2d 809 (2006). Our trial courts are granted the authority "to make any order proper to fully effectuate [their] jurisdiction and judgments," MCL 600.611, and are charged with securing "the just, speedy, and economical determination of every action," MCR 1.105. To effectuate this express authority, our courts have long held that a trial court has the inherent power to control the movement of cases on its docket. *Banta v Serban*, 370 Mich 367, 368; 121 NW2d 854 (1963). "This power is not governed so much by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Maldonado*, 476 Mich at 376. "An exercise of the court's inherent power may be disturbed only upon a finding that there has been a clear abuse of discretion." *Baynesan v Wayne State Univ*, 316 Mich App 643, 651; 894 NW2d 102 (2016) (internal citation and quotation marks omitted).

Contrary to defendant's argument, the trial court did not act in a dilatory fashion by holding the scheduled bench trial rather than ruling on the parties' motions for summary disposition. The trial court had notified the parties at the beginning of June 2016 that a bench

trial would be held on October 31, 2016. Plaintiffs filed their dispositive motion at the beginning of October, and defendant responded with its motion on October 20th. Thus, the trial court had little over a week before trial to read, hear, research, analyze, and rule on the parties' motions, as well as prepare for the bench trial. Given this, it is clear that the trial court's decision to hold the bench trial rather than rule on the motions was plainly calculated to achieve an orderly and expeditious disposition of the lawsuit, a situation far removed from the case relied upon by defendant, *In re Halloran*, 486 Mich 1054, 1054-1055; 783 NW2d 709 (2010). This is the case even if, as defendant asserted during oral argument on appeal, the trial court invited the parties to file dispositive motions.

Furthermore, it defies logic to argue that a party was somehow legally prejudiced because a trial court held a bench trial rather than rule on a motion for summary disposition under MCR 2.116(C)(10). In general, a party can argue that "there is no genuine issue as to any material fact" either by pretrial motion or at trial. Similarly, a trial court can consider evidence submitted in support of a motion under (C)(10) only "to the extent that the content or substance would be admissible as evidence" at trial. MCR 2.116(G)(6). Thus, a party does not gain some kind of evidentiary advantage by seeking relief with a dispositive motion as opposed to presenting its case at trial. Thus, even assuming for the sake of argument that there had been error, defendant has not shown that it was legally prejudiced by having the trial court rule after trial versus on a pretrial motion.

C.     Trial Court Did Not Abuse Its Discretion by Allowing Thomas to Remain as Receiver

Defendant next argues that the trial court erred in appointing and retaining Thomas as receiver. As previously noted, Audrey Klein's original counsel objected to Thomas being the receiver, although counsel did not offer an alternative and did not, in fact, have a problem with Thomas managing the property. Defendant, as Klein's successor-in-interest, did move to remove Thomas as receiver, but the trial court held that the motion was not timely, and defendant does not dispute that decision on appeal. Thus, we review for an abuse of discretion the trial court's decision both to appoint a receiver and whom to appoint, *Ypsilanti Twp v Kircher*, 281 Mich App 251, 272-273; 761 NW2d 761 (2008), and we review any unpreserved claim of error for plain error affecting substantial rights, *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000).

MCR 2.622 governs the judicial appointment of a receiver. A receiver "is a fiduciary for the benefit of all persons appearing in the action or proceeding." MCR 2.622(A). The parties can stipulate to a receiver or, if there is an objection raised, the trial court must state its reasons for selecting a particular receiver. MCR 2.622(B)(4), (5). The court rule provides that a person "may not serve as a receiver" if, among other reasons, the person has "an interest adverse to the receivership estate" or has a position in the action "that will interfere with the impartial discharge of the receiver's duties." MCR 2.622(B)(6)(f),(j).

The trial court did not abuse its discretion when it denied Audrey Klein's original objection to the appointment of Thomas as receiver, and we find no plain error affecting defendant's substantial rights with respect to the estate's subsequent objection and untimely motion. Although the trial court did not make explicit findings in accordance with MCR 2.622, the trial court acknowledged during the first hearing in 2011 that having Thomas as receiver was

not ideal. The record confirms that the trial court closely monitored the situation. The record similarly confirms that the trial court correctly concluded that the general partner of T.B.S.K. "walked away" from, or "did not do anything" for the partnership operation, and that in response Thomas was forced to step forward "to preserve this thing." As plaintiffs point out, Thomas envisioned ending up in receipt of T.B.S.K.'s property, and so, in practical terms, his interests aligned with those of the partnership. Similarly, the mortgagee that had the contractual right to have a receiver appointed consented to have Thomas fill that role. Counsel for Audrey Klein did not object to Thomas managing the property, nor did her counsel object to the second or third receivership reports. Finally, neither counsel for Audrey Klein nor defendant's counsel provided the trial court with an acceptable alternative, and defendant did not move to have Thomas removed until five days before the matter was set for bench trial. Therefore, given this record, defendant's claim of error with respect to the receivership is without merit.

### D. Trial Court Did Not Abuse Its Discretion With Respect to Evidentiary Rulings

Defendant also claims that the trial court erred in refusing to admit various exhibits that defendant offered into evidence. Specifically, defendant identifies five issues upon which the trial court refused to admit purportedly relevant evidence. The issues are: (1) plaintiffs did not seek permission to file a derivative lawsuit; (2) Thomas engaged in self-dealing as the receiver; (3) the T.B.S.K. agreement was ambiguous; (4) plaintiffs breached the agreement; and (5) plaintiffs consented to the 2004 mortgage.

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, the [Michigan Rules of Evidence], or other rules adopted by the Supreme Court." MRE 402. "Evidence which is not relevant is not admissible." *Id.* Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. We review a trial court's evidentiary rulings for an abuse of discretion. *Price v Long Realty, Inc*, 199 Mich App 461, 466; 502 NW2d 337 (1993).

*Permission to File the Lawsuit.* Defendant attempted to offer evidence to show that plaintiffs could have used, but chose not to use reasonable efforts to find the Bartons to seek authority to file the lawsuit. Under MCL 449.2001, "[a] limited partner may bring an action in the right of a limited partnership . . . if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed."

We find no abuse of discretion by the trial court in rejecting this evidence. First, evidence of where the Bartons lived in 2016 had little relevance of where they lived in 2011. Second, it appears from the record that it was the Bartons who left the box of partnership records on plaintiffs' front porch; given this, it was reasonable for plaintiffs to conclude that seeking permission from them to bring the lawsuit in 2011 was not likely to succeed. Third, there was evidence that plaintiffs did contact Audrey Klein and that she told them, in effect, that they could do what they wanted to do with the property. Fourth, relatedly, during the hearing on the receiver's first report, Audrey Klein's counsel did not suggest that her client objected to the lawsuit based on lack of authority under MCL 449.2001. And finally, plaintiffs brought the

lawsuit in their individual capacities as well as their capacities as limited partners, so MCL 449.2001 alone would not have barred plaintiffs' lawsuit for lack of standing.

*Self-Dealing of Receiver.* Defendant sought to make issue of the receiver's reports as well as introduce documents purportedly showing that Thomas was engaged in self-dealing and mismanagement of receiver assets, but the trial court rejected the evidence as not relevant. Because the issue of Thomas' performance was not timely before the trial court during the bench trial, as explained *supra,* we find no abuse of discretion in the trial court's rejection of this evidence.

*Ambiguity of the TBSK Agreement.* At trial, defendant argued that the T.B.S.K. agreement was ambiguous with respect to how property and proceeds were to be distributed during wind up of the partnership. Defendant offered several documents it claimed were relevant to this argument, including a pre-agreement letter of intent and an unsigned (and possibly unsent) letter, but the trial court ruled that the documents were inadmissible because the agreement had an integration clause and was not ambiguous on this point. The trial court did not err.

Contrary to defendant's position below and on appeal, the T.B.S.K. agreement is not ambiguous with respect to wind up. Two bedrock principles of contract interpretation are that (1) the agreement must be read as a whole, and (2) in any conflict between a specific provision and a more general one, the specific trumps the general. *DeFrain v State Farm Mut Auto Ins Co,* 491 Mich 359, 367 n 22; 817 NW2d 504 (2012).

There is only one article that governs termination of the partnership (Article VII), and it is aptly named "TERMINATION OF PARTNERSHIP." Within that article, there is only one section (section 7.1), and, similarly, it is aptly named, "Termination." Section 7.1 expressly states that, when the partnership is "dissolved on the expiration of the term" specified earlier in the agreement, i.e., August 1, 2015, "the partnership shall transfer its interest in the real estate and building . . . to Thomas L. Thesier and Judith L. Thesier free of any debts or liens." And then, "[o]n any such termination, the General Partner shall wind up the Partnership and apply and distribute the *remaining* assets as provided in section 3.2." (Emphasis added). This last provision, requiring the distribution of assets to all of the partners, is subordinate to the prior provision, as this last provision applies only to "remaining" assets. Specifically, the adjective "remaining" modifies the term "assets," and, by this modification, the adjective logically limits the category of assets to be split among the partners at wind up to just those assets, if any, that are left over after the real property and building have been returned to plaintiffs. In other words, the agreement is clear that any right of a partner to a distribution of assets at wind up is subordinate to the plaintiffs' right to the return of the real property and building free of any debts or liens. Thus, the trial court did not err by refusing to admit defendant's purported evidence on this issue.

*Which Party Breached.* Plaintiffs brought a breach of contract claim against defendant and other parties, so the questions of whether there was a breach and, if so, who breached were central to the lawsuit. Defendant argues that the trial court refused to consider its proffered evidence on who breached. Yet, defendant has not clearly identified on appeal any item of evidence that went to this question but was rejected by the trial court. Defendant cannot merely

announce its position and leave it to the Court to develop an argument in support. *Riemer v Johnson*, 311 Mich App 632, 653; 876 NW2d 279 (2015). It is possible that defendant is referring to evidence related to Thomas' acts as receiver (e.g., purported self-dealing and mismanagement of receiver assets), but as already explained, the trial court did not abuse its discretion in rejecting this evidence.

*Consent to the 2004 Mortgage.* Defendant also argued at trial that plaintiffs knew of and acquiesced to the 1996 and 2004 mortgages on the real property and building. To prove this, defendant offered several documents, including the parties' 2004 consent resolution and records showing that plaintiffs received a portion of the refinanced amount. Plaintiffs did not dispute these facts at trial, but instead argued that the facts were irrelevant. The trial court agreed and refused to admit defendant's proffered evidence.

The trial court did not abuse its discretion in doing so. Nothing in the consent resolution suggests that the parties intended to amend the T.B.S.K. agreement by executing the resolution. The agreement plainly states that the partnership can borrow money and "assign any portion or all of the Partnership properties . . . to secure the borrowed money," but that plaintiffs "have no personal liability for these borrowed amounts." This provision must also be read in concert with the termination provision, whereby the real property and building must be returned to plaintiffs "free of any debts or liens." That plaintiffs knew of, acquiesced, and even benefitted financially from the 2004 mortgage does not alter, in any way, these contractual provisions, and it was the meaning and effect of these provisions that had to be resolved at trial.

E.    Judgments Against B. S. & K. and Defendant Klein Estate

Finally, plaintiffs argue on cross-appeal that the trial court erred by failing to award them judgments against defendant B. S. & K. and defendant Klein Estate reflecting the extent to which the mortgage on the property deprived plaintiffs from recovering its full value. Although the judgment after trial states that plaintiffs are to receive no relief from those defendants beyond recovery of the proceeds of the sale of the property, it is apparent from the record that the matter was not actually decided on its merits.

As noted, under the T.B.S.K. agreement, plaintiffs were entitled to recover the real property "free of any debts or liens," but at the time of wind up, the property was burdened by an outstanding mortgage balance. Under section 3.1 of the T.B.S.K. agreement, as the general partner, B. S. & K. shared in the liability for any net losses, which would include a loss created by having to pay off any debt. Plaintiffs thus have a plausible claim against B. S. & K. for some portion of the difference, and partnership law implicates defendant in the matter as well.

According to the Uniform Partnership Act, MCL 449.1 *et seq.*, "Where, by any wrongful act or omission of any partner acting in the ordinary course of the business or the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act." MCL 449.13. A partnership "is bound to make good" any losses stemming from a partner's, or the partnership's, breach of trust. MCL 449.14. Further, "[e]xcept as otherwise provided by [MCL 449.46, which concerns limited liability partnerships], all partners are liable . . . [j]ointly and severally for everything chargeable to the

partnership under [MCL 449.13] and [MCL 449.14]," as well as "for all other debts and obligations of the partnership." MCL 449.15(a). Comporting with these statutory provisions is the common-law rule that all partners are personally responsible for any act or omission of the partnership—including the individual partners acting in furtherance of partnership business. See *Soberg v Sanders*, 243 Mich 429, 431; 220 NW 781 (1928); *Moore v Hillsdale Co Tel Co*, 171 Mich 388, 397; 137 NW 241 (1912).

Plaintiffs assert in their brief on cross-appeal that they "brought a motion for entry of judgment after default to be heard by the trial judge, but at a pretrial conference held in chambers, the trial judge informed counsel that it would not hear the motion when scheduled but would make a decision at trial." No such decision, however, was made on the record. The following exchange took place between the trial court and plaintiffs' attorney at a post-judgment proceeding:

> [COUNSEL]: We filed a cross-claim of appeal because BSK, as the Court will recall, was defaulted but the Court would not allow us to enter a judgment against BSK.

> THE COURT: Why didn't I do that?

> [COUNSEL]: I don't know why you didn't do it, Your Honor. We asked.

> THE COURT: I think I needed to hear the testimony about the other stuff. But . . . what difference does that make to the case?

> [COUNSEL]: It ties up the loose end of, number one, BS&K, and then, we believe that there is a statutory requirement that provides that any general partner in a general partnership, which is what BSK is, if a judgment is entered against BSK, it automatically makes the general . . . partners liable for that.

> * * *

> THE COURT: Well, then, certainly, . . . I think you could ask me to reconsider that ruling, because it wasn't done with the idea of preventing you from trying the case or taking whatever actions necessary. So you certainly . . . are welcome to file a motion to reconsider that before you appeal.

> [COUNSEL]: I'll have to look at the court rules.

Later, as the proceeding wound down, the trial court, addressing plaintiffs' counsel, stated, "[A]s for your judgment on the TBK [sic], I don't know why I didn't enter a judgment. . . . I thought you said you wanted the money, and I said you can't have it until we have a hearing. So if you want to take some other action you are welcome."

The trial court's last word on the subject indicates that it recognized that it had left some of plaintiffs' claims unresolved and that resolution of them might call for additional proceedings. Indeed, in light of what the trial court said, defendant's insistence on appeal that the trial court in

fact considered the matter and simply concluded after trial that plaintiffs were not entitled to anything more than what they received in the judgment is a strained argument, at best.

For these reasons, we VACATE in part the order appealed from to the extent that it denies plaintiffs additional relief in connection with defendant B. S. & K. and defendant Klein Estate, and we REMAND this case to the trial court with instructions to reach and resolve on the record plaintiffs' remaining claims against those defendants. We otherwise affirm the results below.

Affirmed in part, vacated in part, and remanded for further proceedings. We do not retain jurisdiction.

/s/ William B. Murphy
/s/ Kathleen Jansen
/s/ Brock A. Swartzle